13 F.Supp.2d 980 (1998)
Charles E. EMMENEGGER, Robert F. Ritzie, and James E. Riley, Plaintiffs,
v.
BULL MOOSE TUBE COMPANY, Caparo, Inc., Bull Moose Tube, Ltd., and Swraj Paul, Defendants.
No. 4:96CV1095 CDP.
United States District Court, E.D. Missouri, Eastern Division.
July 20, 1998.
*981 David W. Harlan, Partner, Melanie R. King, Gallop and Johnson, St. Louis, MO, for plaintiffs.
James R. Dankenbring, Partner, Francis E. Pennington, III, Partner, Thomas W. Jerry, Francis X. Neuner, Jr., Dankenbring and Greiman, Clayton, MO, for defendants.

MEMORANDUM OPINION
PERRY, District Judge.
This matter is before the Court following a bench trial. Plaintiffs were highly compensated executives who have sued their former employer and its owner for ERISA benefits allegedly due them under a phantom stock plan. All three plaintiffs claim that they were discharged in retaliation for exercising their rights under the plan. They seek benefits under the plan based on the "redemption value," as opposed to the much-lower "book value," of their phantom shares; two plaintiffs also seek severance pay benefits. Defendants contend that plaintiffs were terminated for various acts of negligence and misconduct and therefore are entitled to no more than book value under the plan.
After due consideration of the voluminous record in this case, the Court will enter judgment in favor of plaintiffs on all counts remaining in their second amended complaint.

I. Findings of Fact

A. The Parties
Plaintiff Charles Emmenegger ("Emmenegger") is the former President and Chief Executive Officer of defendant Bull Moose Tube Company ("BMT"). Emmenegger served in this position from 1985 until his termination in the spring of 1996. He joined BMT in 1974. Plaintiff Robert Ritzie ("Ritzie") *982 served as the vice president of finance for BMT from 1987 until his termination in the spring of 1996. Ritzie joined BMT in 1981. Plaintiff James Riley ("Riley") joined BMT in the late 1970's. In his last position with BMT, he served as the company's vice president of marketing development. In December 1994, Riley became vice president of operations of Caparo Steel Company ("Caparo Steel").
Defendant BMT, a Missouri corporation, is a steel tube manufacturer with plants in Trenton, Georgia, Gerald, Missouri, and Chicago, Illinois. Defendant Caparo, Inc., a Delaware corporation, purchased BMT in 1988. Defendant Bull Moose Tube, Ltd. ("BMT, Ltd."), formerly known as Barton Tube, is a Canadian corporation and an affiliate of BMT. BMT, Ltd., and Caparo, Inc., are owned by Caparo Industries, Plc ("Caparo Industries"), a British corporation.
Caparo Industries is a conglomerate consisting of more than a dozen companies that employ close to four thousand people worldwide; its annual revenues exceed nine hundred million dollars. Itself a subsidiary, Caparo Industries is owned by Caparo Group, Ltd., a family trust. The beneficiaries of the trust are Lord Swraj Paul of Marylebone ("Paul"), a defendant here, and his family. Paul is the chairman of Caparo Group, Ltd. A native of India, Paul currently resides in London, England. Paul, who has described himself as having been "born above a steel mill," attended the Massachusetts Institute of Technology before returning to India to participate in his family's steel business. Ambar Paul and Akash Paul, two of Paul's sons, have been joint chief executive officers of Caparo Industries since 1993. A third son, Angad Paul, is also active in the family's businesses.

B. Inception of the Phantom Stock Plan ("PSP")
Prior to its acquisition by Caparo, Inc., BMT was a wholly-owned subsidiary of National Intergroup ("NI"). In 1988, NI decided to sell BMT through an open bidding process. Caparo Industries was the successful high bidder, purchasing BMT for approximately thirty-nine million dollars. Sometime before the sale's closing, Paul learned that BMT's senior management (plaintiffs and several others) wanted an equity stake in BMT. Paul complained to NI that he had not been informed of management's position during the bidding process, and threatened to sue NI. In order to stave off this litigation, NI agreed to reduce the selling price by two million dollars if Paul took action to pacify BMT's management.
The acquisition of BMT by Caparo Industries closed on October 18, 1988. In the months both before and after the closing, BMT's management and representatives of Caparo Industries attempted to negotiate the terms of a mutually acceptable stock ownership program. The negotiations went on for some time, and were occasionally tempestuous. Although BMT's managers wanted to acquire actual stock in the company, representatives of Caparo Industries suggested a Phantom Stock Plan ("PSP") as an alternative to equity participation. Under a PSP, ownership of so-called "phantom" shares is not evidenced by certificates and does not convey an equity interest in the company. However, like actual stock, the value of a phantom share is tied to the company's performance.
After initially rejecting the concept of a PSP, BMT's managers agreed to its creation, and, on August 30, 1989, the BMT PSP was adopted. The PSP called for the issuance of a total of six hundred phantom shares that, initially, were distributed to seven BMT managers. Emmenegger received 204 shares, and the other six managers (Ritzie, Riley, Claude Burnett, David Lichtfuss, Richard Lind, and John Meyer) each received sixty-six shares. Paul and the seven PSP participants signed the PSP.
The purpose of the PSP was to give BMT's senior managers, the plan's participants, an incentive to "grow" the company by deferring compensation. The consolidated financial statements of BMT and BMT, Ltd., indicate that after the plan's adoption, and under the plaintiffs' management, impressive growth did indeed occur. Between 1989 and 1995, the annual net income of the companies rose from $1,494,000 to $9,396,276, a cumulative increase of 529%.
Under the original PSP's terms, the BMT board served as plan administrator. Section *983 2.1 of the PSP concerned the operation of that board, and provided:
Except as hereinafter provided, the Plan shall be administered by the Board, which may from time to time issue rules, regulations or orders, adopt resolutions and make determinations relating to the Plan, interpret the provisions of the Plan and supervise the administration of the Plan. Subject to the express provisions of the Plan, the Board shall have authority in its discretion to determine the number of Phantom Shares to be awarded to a Participant and the senior managers who will be Participants. All determinations shall be by the affirmative vote of the Board at [a] meeting called for such purpose or reduced to writing and signed by all of the members of the Board. Subject to the Corporation's by-laws, all decisions made by the Board in the reasonable exercise of its discretion in good faith shall be final, conclusive and binding on all persons, including the Corporation,[1] its stockholders and its officers.

C. Adoption of the Revised Phantom Stock Plan
On February 21, 1991, a revised PSP was adopted. Under the terms of the revised PSP, the board administering the plan changed from the BMT board to the board of Caparo, Inc. In its definitions section, the revised PSP states, "The term `Board' means the Board of Directors of Caparo, Inc., a Delaware corporation." During 1994 and continuing until early 1996, Paul, Emmenegger, and Ritzie constituted the only members of the Caparo, Inc., board.
Section 2.1 in the original PSP and Section 2.1 in the revised PSP are the same, with the exception that in the revised PSP, the word "Corporation" is pluralized throughout.[2] Section 2.1 of the revised PSP stated that all determinations concerning the plan "shall be by the affirmative vote of the Board at [a] meeting called for such purpose or reduced to writing and signed by all of the members of the Board." Paul testified at trial that despite the existence of § 2.1, he believed that Caparo Industries, and not the Caparo, Inc., board, was responsible for running the plan. Paul exercises complete control over both Caparo Industries and the Caparo Group, Ltd.

D. Valuation of Phantom Stock
Both the original and revised PSPs contemplated two possible calculations for valuing phantom stock: book value or redemption value. Book value of a phantom share was established by dividing the value of BMT's assets by the number of shares of BMT common stock outstanding as of the date of the calculation. Redemption value of a phantom share was determined by a formula involving a multiple of adjusted net after-tax corporate earnings. A participant could redeem a vested share and receive either book value or redemption value at any time.
Under § 8.1, an employee who was terminated "without cause" or by retirement, death, or disability, was entitled to redemption value. Anyone terminated for reasons other than those in § 8.1 would get only book value.[3] Under the definitions section of the PSP, termination without cause means termination for reasons other than:

*984 (i) willful or gross misconduct or willful or gross negligence of his duties for the Corporations, (ii) intentional or habitual neglect of his duties for the Corporations or (iii) theft or misappropriation of the Corporations' funds or the commission of a felony ...
As noted above, the revised PSP defined "Corporations" to mean BMT and BMT Tube Ltd.

E. Stock Sell-backs and Membership Changes Under the Revised Phantom Stock Plan
Under section 5.2 of the revised PSP, original participants in the plan could sell back to Caparo, Inc., up to ten percent of their initial shares of phantom stock, which would then be redistributed to new participants in the plan. Section 5.2 further provided that the price of these redistributed shares would be annually determined by the original plan participants subject to Board approval.
The PSP shareholders met in November 1990. Anticipating the adoption of the revised PSP, and pursuant to § 5.02 of that plan, the participants decided to propose selling back a total of twelve shares to the company, and adding three new participants to whom the twelve shares would then be redistributed. Under the proposal, Emmenegger was to sell back 4.02 shares, and the other six original participants were to each sell back 1.33 shares, at a price of $5,000 per share. In February 1991, at the same time that the Caparo, Inc., board approved the revised PSP, it also approved adding the three new participants to the plan.
At the November 25, 1991 annual meeting of the PSP shareholders, the participants decided to sell back to Caparo, Inc., an additional twenty-seven shares[4] (again at $5,000 per share), and then to immediately redistribute those shares to non-original participants. The participants also voted to add another participant to the PSP. The Caparo, Inc., board agreed to the redistribution and the new participant at a February 1992, meeting, which was memorialized in a March 11, 1992, memorandum headed "Minutes to the Board of Caparo, Inc."
In January 1992, Emmenegger terminated two of the original participants, Lind and Burnett, from their employment at BMT for performance reasons. After they threatened to take legal action against BMT, BMT made lump sum settlement payments to them. However, Lind and Burnett did not receive any payment for their fully vested[5] 123.42 phantom shares ("Lind/Burnett shares"), which were returned to the plan.[6]
On November 23, 1992, the PSP's participants held their annual meeting. Ritzie prepared the minutes of the meeting, which are dated January 11, 1993. According to those minutes, the attendees at the meeting agreed to propose the following:
(1) That two new participants be added to the PSP.
(2) That the remaining five original participants sell back a total of twenty-one shares (9.16 from Emmenegger and 2.96 each from the other four remaining original participants) to the company, again at $5,000 per share.
(3) That those twenty-one shares then be redistributed to the six new participants.
(4) That twenty-one of the Lind/Burnett shares be redistributed to the original participants to nullify the effect of the sale described in (2) above on their respective share holdings.
(5) That 30.42 of the Lind/Burnett shares be redistributed to the original participants in order to return them to the same number of shares that they had at the plan's commencement.
(6) That thirty-two of the Lind/Burnett shares be redistributed to the new participants.
*985 In January 1993, the Caparo, Inc., board met and approved a "distribution of shares" reflecting the six above-described proposals. However, the board's approval was not formally documented until January or February 1994, when "Amendment # 1" was signed by Paul and all of the plan's current and added participants.
The Court finds the above history relevant and significant for several reasons. First, it indicates that Paul was well aware  or should have been well aware  that redistribution of phantom shares was a common and ongoing practice (the issue of redistribution, as explained more fully below, later became a critical bone of contention between the parties). Second, it reveals the rather casual manner in which the PSP operated, as exemplified by the lengthy delay between the adoption of the proposals that became Amendment # 1 and the actual signing of that document. Third, it indicates that the Caparo, Inc., board both could, and did, take actions pursuant to § 2.1 of the PSP, which were arguably inconsistent with other of the plan's provisions. This third point is illustrated by the Board's decision to permit redistribution of the Lind/Burnett shares. Under § 8.2 of the revised PSP, a participant's departure from BMT prior to the vesting of his shares results in the forfeiture of those shares. The section further provides that forfeited shares "shall be available for award to other Participants." The negative implication apparent in that phrase is that a terminated employee's vested shares cannot be forfeited. (Indeed, the word "vest" might reasonably be read to mandate such an interpretation.) The Caparo, Inc., board, including Paul, nevertheless deemed the Lind/Burnett shares forfeited, and allowed them to be reissued.

F. The Lichtfuss Shares
On January 3, 1994, Lichtfuss, one of the original PSP participants, submitted his resignation and simultaneously submitted a request to redeem his phantom shares ("the Lichtfuss shares"). With Lichtfuss's resignation, a question arose whether Lichtfuss was entitled to receive book value or redemption value for those shares.
As set forth above, under the terms of § 8.1 of the plan, a fully vested BMT employee who is terminated without cause "shall" be paid the redemption value of any vested phantom shares that he owns. Section 8.2 of the plan provides that if a participant's employment ceases for reasons other than those set forth in § 8.1, then that participant "shall" receive the book value of his vested phantom shares. BMT obtained a legal opinion that payment of book value to Lichtfuss was all that was required by the PSP's terms.
The Caparo, Inc., board met on April 25, 1994, to consider issues relating to the plan, including the valuation of the Lichtfuss shares. Paul, Emmenegger, and Ritzie, who then constituted the board, attended this meeting. The board determined that Lichtfuss was entitled to book value, or a total of $48,444 ($734 per share multiplied by sixty-six shares). Emmenegger and Ritzie proposed to Paul that the Lichtfuss shares be redistributed to certain plan participants, including themselves and Riley, and that two new participants, Terry Rowles and Steve Birk, be added. Under the proposal, Emmenegger would receive six shares and Ritzie and Riley nine shares each.
From the record in this case, it is absolutely clear that the involvement of Emmenegger and Ritzie in the Lichtfuss redistribution was the driving force behind their dismissals. Paul has consistently maintained that he did not approve the Lichtfuss redistribution, and claims that he considered the redistribution to have been only a suggestion. Emmenegger and Ritzie testified to the contrary. The Court finds plaintiffs' testimony in this regard to be credible, and Paul's not so.
A significant amount of circumstantial evidence supports the Court's credibility determination. First, although the redistribution was not memorialized in writing, Paul admittedly received a shareholder worksheet detailing the redistribution. At his deposition Paul claimed the subject of redistribution of the Lichtfuss shares "never came up" at the April 25 meeting, but at trial he admitted receiving the handwritten worksheet regarding the redistribution. Paul's handwriting appears on the worksheet and it was found in the London files. Second, informal minutes taken by Ritzie during this meeting state *986 that the redistribution was approved. Third, given Paul's belief that the Caparo, Inc., board was not responsible for operating the plan, it is conceivable that Paul assented to the redistribution believing that he was merely endorsing a proposal that he would later have time to reconsider. Fourth, assuming Paul did realize that he was formally approving the redistribution, he probably thought little of it. At trial, Paul at least three times described the redistribution as a situation in which "more than a million dollars" was "being gifted away." However, in April 1994, the sixty-six Lichtfuss shares were worth nowhere near that amount: they had a total redemption value of $95,556.[7] A man of Paul's substantial means may well have perceived that sum (to be distributed among seven top managers at one of his more than a dozen companies) to be relatively insignificant.[8] Fifth, following the meeting, participants were informed of their additional shares and were issued certificates of entitlement. The two newly-added participants testified that they each received an individualized PSP statement from Ritzie. If Emmenegger and Ritzie really did not believe that Paul had agreed to the redistribution, issuing those statements would have been a totally irrational act.[9] All the evidence at trial showed that although Emmenegger and Ritzie had the technical power to outvote Paul on the Caparo, Inc. board, they never even considered doing so on any issue, an entirely reasonable approach given that Paul owned the company.
Finally, at trial, the Court had an opportunity to observe  at length  the three key parties, Paul, Emmenegger, and Ritzie, testify on the stand. The Court credits the testimony of the two plaintiffs not only because of its content but also because of the lucid and believable manner in which it was presented. While Ritzie's and Emmenegger's testimony was not always perfectly consistent, and did not always provide a precise or pat explanation for every document produced in evidence, these minor discrepancies are indicia of persons testifying honestly, and not attempting to embellish the facts in their favor. Paul's testimony, in contrast, revealed him to be a man with little time for details and given to making snap judgments, whose testimony frequently changed with the context, when challenged on cross-examination, or to fit his current explanation of the events. For example, with regard to the PSP itself, Paul stated, "[I] do not understand the plan. I did not ever read the plan ...." At another point in his testimony, he admitted to reading the plan, but not in detail, and stated that somebody "must have done a full note to me ... [of] the main salient points and explained it to me." At one point he claimed that in the negotiations leading up to the adoption of the PSP he simply relied on his attorneys at Wilkie Farr, but later claimed his negotiating position was hampered because he mistakenly relied on Emmenegger's opinion about corporate law, rather than consulting Wilkie Farr on an important issue. Although he claims to have been born in a steel mill and brought up in the business, on cross-examination he denied having expertise in the steel making industry. On cross-examination, he stated that he did not know if he had the authority to terminate any of his employees, although at his deposition he testified that, as to the board of directors at BMT, "... I was the board. I was the shareholder. So if the board disagreed with me, ..., they will have to listen to me." He also testified that, "... without my approval in Bull Moose, no decision will be taken." At trial, Paul admitted telling some of the employees (in 1996) that he considered the Lichtfuss share redistribution to be "stolen property," but at his deposition he flatly denied ever likening the transaction to "someone dealing in stolen property." His testimony was most inconsistent when he described his management style: on the one hand, when details did not support defendants' theories, he claimed he couldn't be bothered with details, that he hired good people, delegated authority, and relied on his subordinates; on the other *987 hand, he criticized Emmenegger for not obtaining his approval for extremely minor transactions, and claimed that even minor decisions could not be made without his express approval. Given Paul's inconsistent testimony and professed inattention to detail, the Court finds it easy to believe that he did in fact approve the Lichtfuss redistribution in April 1994, and the Court so finds.
Also at the April 25, 1994, meeting, Paul asked Emmenegger and Ritzie to develop proposals for improvements in the PSP. Paul asked John Smith and Colin Steel, both finance directors at Caparo Industries who were based in England, to review Emmenegger's and Ritzie's proposals for changing the PSP. During the first quarter of 1995, Steele and Ritzie corresponded a number of times regarding the PSP. Steele testified that at that time, he was unaware that the Lichtfuss shares had been redistributed, even though he admitted receiving, in December 1994, a copy of the shareholder worksheet that had been given to Paul at the April 1994 meeting. (Steele stated that at the time he received the worksheet, he thought it of little significance, and quickly forgot about it.)
While Steele was a credible witness, and his memoranda to Ritzie tend to support his testimony that he was ignorant of the Lichtfuss redistribution, the Court finds nothing untoward in the fact that Ritzie did not correct Steele's misapprehension. Just as Steele testified that he did not recognize the significance of the shareholder worksheet, and never inquired of Ritzie as to its meaning, Ritzie testified he mistakenly believed that following the April 1994 redistribution, some Lichtfuss shares remained which had not been redistributed. As a result, Ritzie believed that Steele's references to the Lichtfuss shares pertained only to those shares that (according to Ritzie's erroneous belief) were still available for re-issuance. Ritzie viewed Steele's main concern to be not one of re-issuance, but rather one of valuation, i.e., determining the basis to be assigned to redeemed shares that were to be re-issued in the future. Ritzie stated that he viewed re-issuance as a non-issue because he knew that redeemed shares could, in fact, be re-issued  as the Caparo, Inc., board had done at its April 1994, meeting. Ritzie made no secret of that view. For example, throughout his tenure as BMT's vice president of finance, Ritzie made "full provision" for all 600 PSP shares on BMT's books, including those that had been sold back to the plan. In other words, he always treated redeemed shares as a future liability of BMT. And, in a February 28, 1994, memorandum to Smith, he and Emmenegger wrote, "If [the Lichtfuss] shares are determined to be worth $733.69 per share [i.e., book value], then that value will be deducted from all future pay outs of the shares when awarded and redeemed." (Emphasis added.)
After viewing Ritzie's demeanor on the stand and considering the content of his testimony and the evidence as a whole, the Court finds that Ritzie's failure to inform Steele of the Lichtfuss redistribution was the result of nothing other than an unfortunate, but innocent, miscommunication on the part of both parties. Certainly, the record does not support defendants' contention that Ritzie tried to hide the Lichtfuss transaction from Steele. Indeed, since the redistribution involved a number of individuals other than plaintiffs, it would have made no sense for Ritzie to have done so.

G. Caparo Steel Company
Sometime in 1992, Paul told Emmenegger that he was interested in entering the steel-making business in the United States. In April 1994, Emmenegger and Paul visited the Sharon Steel Company in Farrell, Pennsylvania. Sharon Steel was in bankruptcy; its steel works, consisting of approximately 180 buildings and roughly 400 acres of land, had been out of commission for over two years. Much of its equipment dated back to the 1960's.
In October 1994, the bankruptcy court authorized an auction of Sharon Steel's assets. Caparo Industries made the high bid of $26 million, to purchase the existing plant and equipment on an "as is" basis. The transaction closed on December 2, 1994. The parties had initially projected an early October closing. A new company, Caparo Steel Company, was established to start up and operate the Farrell facility.
On December 2, 1994, the day that Caparo Steel came into existence, the entire company *988 consisted of only Emmenegger, Ritzie, Riley, and Richard Klein, another BMT executive. Emmenegger became Caparo Steel's president and chief executive officer, and also retained those positions at BMT. Ritzie became Caparo Steel's vice president and chief financial officer, and also kept his position as BMT's vice president of finance. Klein became Caparo Steel's vice president of administration. Emmenegger, Ritzie, and Klein continued to live in the St. Louis area, but began visiting Farrell on a regular basis.
Emmenegger asked Riley to leave BMT to become Caparo Steel's vice president and chief financial officer. Riley agreed, and formally started working as a Caparo Steel employee on January 1, 1995. With Paul's knowledge and consent, Riley was permitted to remain a participant in the BMT PSP through January 1, 1996.
Despite the two-month delay in the acquisition of Caparo Steel, Emmenegger and the others determined to meet their previously-announced goal of making the facility operational by April 1995. Emmenegger hired CMR Construction Company ("CMR"), a St. Louis-based contractor, to serve as general contractor during the start-up of Caparo Steel. BMT had used CMR in the past for several different projects. In addition, Emmenegger had for three years served on CMR's board of advisors. No formal contract between Caparo Steel and CMR was ever signed.
Once Caparo Steel became operational, Caparo Steel retained CMRI to act as maintenance contractor for the facility at a monthly rate. CMRI was a joint venture involving CMR and several of the larger subcontractors that worked on the Caparo Steel start-up. Caparo Steel's management believed that using a maintenance contractor was cost-effective because it lowered the company's fixed costs (i.e., it reduced the number of hourly or salaried personnel that Caparo Steel would otherwise have been required to hire). In October 1995, CMRI sent Emmenegger a proposal for an agreement. However, during a November 1995, visit to Caparo Steel, Paul forbade Caparo Steel's management from entering into that agreement. Thus, during the relevant time period, no contract governed the relationship between Caparo Steel and CMRI.
Caparo Steel met its goal of beginning production in April 1995. The company's start-up costs, however, were higher than originally estimated, totaling over $24 million. On June 8, 1995, Caparo Steel held an open house to celebrate the facility's re-opening. In a speech that day, Paul effusively praised the work of Emmenegger and Riley, and presented them with engraved watches. Paul stated, "It is difficult to single out colleagues, but I must mention the exceptional contribution of our American team and the leadership of Chuck Emmenegger, President of Caparo USA. I would especially like to mention our Vice President of Operations, Jim Riley, whose outstanding performance in getting the mill up and running in so short a time is a splendid example." Paul further stated that the Caparo Group's total investment in Caparo Steel would reach $150 million over the next three years.
Caparo Steel began losing significant amounts of money almost immediately. These losses were due, in part, to frequent problems that it was experiencing with its aging equipment. During visits to the facility in August and November 1995, and again in January 1996, Paul expressed concern regarding the losses. In addition, Paul told Emmenegger that an internal auditor should be hired to perform the auditing of Bull Moose and Caparo Steel.[10] When Ritzie brought the accounting firm of Coopers & Lybrand ("Coopers") in to make a presentation regarding internal controls, however, Paul walked out of the meeting, declaring it a waste of time. Paul also told Emmenegger that Caparo Steel needed more managers who were permanently on-site. In response to Paul's concerns, Emmenegger hired Anthony Kurley as president and chief operating officer of Caparo Steel in December 1995. On January 2, 1996, Kurley announced that Riley would continue as Caparo Steel's vice president of operations.
*989 Paul questioned the role that CMR was playing in Caparo Steel, voicing concern that CMR might be exploiting its relationship with Emmenegger.[11] After rejecting the Coopers' suggestions on internal controls, Paul asked Coopers to investigate CMR and CMRI's role in Caparo Steel. Coopers then prepared several reports on Caparo Steel. None of the reports satisfied both Paul and Emmenegger, and Coopers revised the reports several times.
On December 12, 1995, Coopers sent Paul an assessment report addressing two questions: (1) "What is behind your large maintenance demands and expenditures?" and (2) "Is CMRI a viable supplier?" With respect to the first question, Coopers found that Caparo Steel's high maintenance costs had numerous causes, including: the age and condition of the physical assets, an experience curve associated with the performance of maintenance, inadequate maintenance planning, and past operating practices. The report also found that the company's maintenance structure was fragmented, that procedures for using outside contractors were unclear, and that maintenance support systems were lacking. However, Coopers stated that CMRI had done "quality work," had "made an investment," and had "demonstrated a commitment to serving Caparo." The report went on to explain, "The reason why so much of your maintenance dollar has gone to them ... is that your people have been eager to use them and they have been too opportunistic to offer ways of controlling these costs. These are not reasons to terminate the relationship but, instead, to insert controls and formality into your business arrangement."
Paul was dissatisfied with the December 12, Coopers report, and asked Coopers to obtain additional information regarding costs associated with the work performed or coordinated by CMR and CMRI during the start-up phase and continued operation of Caparo Steel.
On February 14, 1996, Coopers sent another draft report to Paul reviewing the costs associated with the work performed and coordinated by CMR and CMRI. The report indicated that Caparo Steel could have realized $222,000 in savings by contracting directly with the five largest subcontractors, rather than using CMRI as an intermediary. In addition, it found that CMRI was charging its 7% management fee on its fixed costs, which was contrary to Coopers' "understanding" of the parties' unwritten agreement. That discrepancy amounted to $53, 000. Coopers also identified another $538,000 in costs that it believed had not been allocated to specific projects. It referred to these as potential "savings," but the evidence showed these costs were, at most, allocated improperly on the books. Emmenegger objected that this report failed to take into account the savings that Caparo Steel was experiencing by not dealing directly with the subcontractors.
On February 28, 1996, Coopers issued yet another revised draft of its report on the situation at Caparo Steel. At Emmenegger's suggestion, Coopers divided this draft into three segments: the start-up stage, the initial production stage, and the production enhancement stage. Regarding the last stage, Coopers stated, "Caparo Management has instituted a number of initiatives aimed at removing some of the improper elements of the CMRI business relationship such as ... eliminating the 7% markup on fixed overhead costs and rental equipment." Coopers further noted that management had demonstrated "a more proactive approach in dealing with CMRI" after the start up phase. Coopers concluded, "We believe outsourcing to a general contractor continues to make sense and, considering the controls now in place, and with the modifications management is contemplating, it is reasonable to stay with CMRI." Paul objected to this report, and asked for revisions which he directed not be sent to Emmenegger.
In response to this latest directive from Paul, Coopers sent a letter, dated March 8, 1996, to Paul explaining that "approximately $7 million" of the $30 million that Caparo Steel expended to complete its start-up and maintenance phases "represented unanticipated *990 costs." Of this $7 million, Coopers reported that $710,000 related to charges by CMR or CMRI. According to Coopers, the remaining $6 million plus was due to unexpected problems in the mill, low productivity, and operating practices in the melt shop. Coopers noted, "Variances such as these are not inconsistent in a mill startup, especially one that stood idle for so long." In his trial testimony, Paul stated that this letter formed the basis of his belief that CMR and CMRI had "raped" him of two million dollars.
Defendants cite the failures of Caparo Steel as an additional reason (that is, additional to the controversy surrounding the Lichtfuss share reissuance) for dismissing plaintiffs, refusing to give severance pay to Emmenegger and Ritzie, and denying plaintiffs the redemption value of their phantom shares. Defendants' explanation does not withstand scrutiny.
Long after plaintiffs' departure from Farrell, Caparo Steel's woes persisted (and, apparently, continue to persist). In the months following plaintiffs' terminations, Caparo Steel continued to lose substantial amounts of money. For each month from July 1996 to February 1997 it lost an average of almost two million dollars per month.
Caparo Steel never implemented the $100 million capital improvement plan to which Paul committed in June 1995. Instead, it shut down its two electric are furnaces, its blooming mill, its ingot facility, and its hot strip mill. It has laid off ninety of its three hundred and twenty employees. The February 1997 audit report of Caparo Steel's financial statements for 1995 and 1996 contained a "going concern" qualification, which stated: "The Company has incurred significant recurring losses from operations and has required additional financing from its parent company which raises substantial doubt about the Company's ability to continue as a going concern."
In sum, the record indicates conclusively that the bulk of the responsibility for Caparo Steel's troubles cannot fairly be laid at plaintiffs' collective doorstep. While it is true that Caparo Steel's controls could have been stronger during the initial months that the company operated, and that CMRI was responsible for certain overcharges (albeit not approaching the scale that Paul believed), even the several Coopers reports show nothing more than, in hindsight, some poor management decisions. Certainly, they reveal no actual wrongdoing on the part of plaintiffs, and nothing that could even be characterized as negligence. Caparo Industries, at Paul's direction, bought a bankrupt, decades old steel mill that had been out of operation for two years, and, again at Paul's direction, failed to invest sufficient capital to bring it up to standards; it is now reaping the whirlwind its own actions sowed.

H. Plaintiffs' Final Months at Bull Moose

1. Controversy Surrounding the Phantom Stock Plan ("PSP")
Despite the fact that the PSP's participants submitted various proposals for revising the plan to Paul in late 1994, no action was taken to revise the plan in 1995. At the time Paul indicated to the participants that he was interested in revamping the plan; at trial he characterized this effort as a "useless exercise." The participants began to grow anxious. Although the redemption price of vested shares was expected to be (and in fact was) at an all-time high in 1996, Paul was proposing to withdraw cash from BMT in order to cover Caparo Steel's losses. The participants believed that such a withdrawal would stunt BMT's ability to grow and thus adversely affect the value of their phantom shares.[12] Accordingly, they wanted any such withdrawal to be in the form of a dividend  rather than a loan  and they wanted to restore the original wording of § 1.6 of the PSP prior to the 1991 amendment.[13]
*991 On December 28, 1995, the PSP's participants held a meeting, and determined that they would redeem their shares en masse unless the plan was revised to include an expanded growth provision, retention of shares, and a four-year payout of current value. Jim Riley, of course, had to redeem his shares as of January 1, 1996, under the agreement he reached with BMT when he moved to Caparo Steel. The decision of the remaining participants was communicated to Paul at a January 22, 1996, meeting of the Caparo, Inc., board.
At the January 22, 1996, board meeting, various issues relating to the PSP, including the Lichtfuss share redistribution, were discussed. Paul claimed that he had never approved the redistribution.[14] In addition, Paul made a thinly veiled threat to fire any plan participant who attempted to redeem all of his phantom shares. Emmenegger's contemporaneous notes of the meeting state, "Anyone cashing in  [Paul] said it's our right but he would then decide if he wants them working for him." Minutes of the meeting reveal that Paul stated that he would "question the commitment" of any shareholder who redeemed all of his shares in 1996. At his deposition, Paul flatly denied, three times, ever having made this comment or saying any words to that effect. At trial, however, on direct examination Paul readily admitted having said that if the managers cashed in all their PSP shares he "would really be interested to know what is their commitment to the company." He explained that he was merely expressing his concern that any manager who cashed in all his shares would be indicating a lack of faith in the company and therefore should not be part of management. When confronted with his clearly inconsistent deposition testimony, he claimed that the questions were not sufficiently precise. Paul also acknowledged at the meeting that the plan was obligated to fulfill the redemption request that Riley had filed on January 1, 1996. Paul testified at trial that he felt the shareholders were attempting to threaten him by their statement that they would engage in an en masse redemption unless action was taken to revise the plan, although he contended he was not susceptible to such a threat because the amount of money involved was inconsequential. He also testified that he felt that Emmenegger was "blackmailing" him, and was acting as a "shop steward" rather than as president of the company.
In the weeks following the January 22, 1996, meeting, Emmenegger and Paul exchanged several letters concerning the disputes. Each expressed concerns that the other was insufficiently interested in growing the company.
On March 1, 1996, BMT and the phantom shareholders entered into a "standstill agreement" to run through March 20, 1996. Under the agreement, the parties agreed to meet to negotiate their differences over the plan. The standstill agreement further provided that during the period that it remained in effect, "no firings nor disciplines will take place, and no extraordinary transactions will be initiated by any Party concerning the other." On March 6, 1996, the PSP's participants sent a memorandum to Paul and Ambar Paul raising thirteen issues about the plan. In the memorandum, the participants stated their position that the Lichtfuss share redistribution of April 1994 "must be confirmed."
Pursuant to the March 1, standstill agreement, meetings were held on March 18-20, 1996. Steele, Smith, and a Coopers partner represented BMT, while Vince Canby, Ritzie, and a KPMG Peat Marwick partner represented the shareholders. BMT's representatives proposed a deal which required the participants to acknowledge that the Lichtfuss share redistribution never occurred. As part of the deal, the company sought to have the participants sign a release absolving the company of any legal liability for the Lichtfuss redistribution or the dispute over it. However, it would not agree to a similar release for the participants. Steele testified that the company refused to agree to a mutual release because it "didn't want to prejudice any rights [it] m[ight] have against Mr. Emmenegger and Mr. Ritzie for having done the *992 deed in the first place." Given the company's stance on the release issue, William Buckley, the attorney for the PSP's participants, advised the participants against agreeing to the deal, and it thereafter fell apart.

2. Plaintiffs' Termination
On March 12, 1996, Paul advised Emmenegger and Ritzie that they were being relieved of their duties at Caparo Steel and Caparo, Inc. Also on March 12, Emmenegger submitted a redemption request to BMT stating that he wished to redeem his 204 original phantom shares. He further stated that he was not redeeming his "remaining 6 [Lichtfuss] shares ... at this time." On June 6, 1996, Emmenegger submitted a redemption request for those six shares.
On March 21, 1996, the day after the standstill agreement expired, Paul sent a memorandum to all BMT employees announcing that Emmenegger was being terminated and Ritzie suspended, and naming Ambar Paul the new chairman and chief executive officer of BMT. Also on March 21, Caparo, Inc.'s board was reconstituted. Emmenegger and Ritzie were removed as directors, and a new board consisting of Ambar and Akash Paul, Smith, and Steele was installed.
Ambar Paul met with Ritzie on March 21, 1996, to advise him of his suspension. In a letter dated that same day, Ambar Paul wrote Ritzie advising him that he was suspended "to and including April 17, 1996." Ambar Paul further stated, "it is my opinion, based upon the circumstances, that your conduct as a director and officer, with reference to the [PSP], including but not limited to the issue of the so called `Lichtfuss Shares', created the appearance of impropriety." Ambar Paul also stated his understanding that Ritzie would submit "an acceptable letter of apology." Ritzie duly submitted a letter of apology on April 14, 1996, but this letter was not acceptable because it did not acknowledge wrongdoing with regard to the Lichtfuss redistribution.
On April 24, 1996, Smith sent a memorandum to Paul and Ambar Paul recommending that Ritzie be dismissed.[15] In listing "the critical issues to take into account" in determining whether dismissal was warranted, Smith first cited Ritzie's role as "a party to issuing Phantom Shares that were not authorized." On April 30, 1996, the directors of Caparo, Inc. (Paul, Ambar Paul, Akash Paul, Angad Paul, John Smith, and Colin Steele) met by telephone and passed a resolution removing Ritzie from all of his positions at BMT "for reason [sic] other than those set out in Section 8.1 of the Bull Moose Tube Company Phantom Stock Agreement, as amended." Ritzie submitted a redemption request for his PSP shares on May 1, 1996.
On March 15, 1996, three days after firing Emmenegger and Ritzie from Caparo, Inc., and Caparo Steel, Paul dismissed Riley from Caparo Steel. Because of the standstill agreement, Caparo Steel paid Riley through March 21, 1996. Although Paul testified that he fired Riley for "performance reasons," Caparo Steel nevertheless paid him twelve weeks of severance pay. The Caparo Steel severance policy provided that the company would provide severance pay "to employees who are terminated for reasons other than disciplinary and who have given the Company excellent service during their employment at Caparo Steel."[16]
As already mentioned, Riley had submitted a redemption request on January 1, 1996. The request included his original shares and his "reassigned" shares. Although the PSP defines the term "Payment Date" to mean "sixty (60) days after any event requiring payment," (or March 2, 1996, in Riley's case) BMT has never paid Riley for any of his phantom shares. The record indicates that Riley spoke with Steele on March 14, 1996. Steele told Riley that he was entitled to the redemption value of his sixty-six undisputed (i.e., non-Lichtfuss) phantom shares. In his trial testimony, Paul stated that "there was no question about [Riley's] redemption or any argument about it." Paul testified that Riley had simply not been paid because he *993 was Emmenegger's crony, and because he filed this suit.

3. Emmenegger and Ritzie's Service Letters
On March 21, 1996, Emmenegger wrote BMT requesting a service letter. In a May 3, 1996, letter drafted by Smith, Paul stated that Emmenegger's employment was terminated "because of actions and inactions by you which, in the view of the Directors of Caparo Inc. and the Board of Directors of Bull Moose, constituted misconduct and neglect of duties on your part." Paul then listed the following: (1) failure to obtain review or approval of bonus payments and salary increases to managers of BMT, Caparo, Inc., and Caparo Steel, (2) failure to appoint an internal auditor for Caparo, Inc.'s United States operations and to communicate regarding financial matters in a timely and accurate manner, (3) failure to follow proper procedures and to act in BMT's best interests concerning the PSP, (4) failure to monitor or properly account for disbursements relating to BMT's 1993 acquisition of the land adjoining its headquarters, and (5) failure to sufficiently control or properly monitor the start-up and operations of Caparo Steel as reflected in Coopers' reports.
Ritzie requested a service letter from BMT on May 1, 1996, which Paul provided on June 12. In the letter, Paul stated,
Your employment was terminated because of actions and inactions by you which, in the view of the Board of Directors of Caparo, Inc. and the Board of Directors of Bull Moose, constituted misconduct and neglect of duties on your part. Examples of such actions and inactions include the following:
(1) your failure to implement and enforce adequate controls necessary to the successful financial operation of Caparo, Inc. and Caparo Steel Company;
(2) your failure to follow proper procedures and otherwise act in the best interests of Bull Moose in matters relating to Bull Moose's Phantom Stock Plan; and
(3) your failure to properly monitor and report financial matters in regard to the start up and initial operation of Caparo Steel Company which, based on investigations conducted by Coopers & Lybrand, resulted in substantial cost overruns and financial losses.
The Court cannot accept at face value the reasons set forth in the service letters sent to Emmenegger and Ritzie. The Court finds that, to a significant extent, the letters represent defendants' calculated attempt to characterize plaintiffs' conduct as falling outside § 8.1 of the PSP, and do not reflect the true reasons for the terminations. That characterization is not only inaccurate, it is also contrived. Several examples prove this point. First, the evidence shows that the salaries and bonuses were properly reported each year, in accordance with procedures established when Caparo purchased BMT. Second, as has already been explained, plaintiffs' stewardship of Caparo Steel, while not beyond reproach, hardly caused the myriad hardships that befell (and continue to befall) Caparo Steel. Third, with respect to the internal auditor issue, Paul himself testified at trial that since Emmenegger's departure, no one has been formally appointed to serve as internal auditor for Caparo, Inc.'s United States operations.[17]
The fourth example, involving the land transaction cited by Paul in his service letter to Emmenegger, requires the Court to go into more detail. In early February 1996, Paul asked Smith to travel to St. Louis to investigate several matters, including the details of a June 1993 transaction in which Bull Moose Tube Holdings ("BMT Holdings"), a corporation set up to manage BMT's real estate holdings, acquired the land adjoining its headquarters from Charter Oaks. Smith appeared at BMT's St. Louis office without previously notifying anyone in St. Louis that he was coming, and inspected books and asked questions about the land transaction and other items. The evidence shows that plaintiffs fully cooperated with this surprise inspection from London.
In 1991, BMT Holdings purchased the office building where BMT had its headquarters from Clarkson Oaks Partnership for $2.8 *994 million, which was below its appraised value. As part of this deal, BMT Holdings agreed to contract with Chestnut Consulting to provide the building's management for a five-year period at an annual rate of $36,000. Under this contract, Chestnut agreed to handle all tenant complaints, negotiate contracts with maintenance vendors, and coordinate several improvements to the physical plant. The two principals of Chestnut were Mike and Chuck Rallo, who were also members of Clarkson Oaks, and who are principals of CMR.[18]
In December 1992 or January 1993, Paul told Emmenegger that he was interested in investing an additional one to two million dollars in U.S. real estate. In order to avoid paying a real estate commission, Emmenegger negotiated with Chestnut to look for suitable property. He agreed to pay Chestnut a flat fee of $25,000 if BMT Holdings purchased property.
After doing some research, Chestnut proposed that BMT Holdings buy a four acre parcel of land adjoining BMT's headquarters. Charter Oaks owned the parcel, but was having trouble making payments on the unpaid mortgage balance of $970,000. Emmenegger obtained Paul's approval to spend up to $750,000 for the property, which was below its appraised value and below the asking price of $1.2 million. BMT Holdings then offered the bank holding the mortgage $700,000 for the property. The bank rejected the offer, stating that it would be acceptable only if Charter Oaks provided some additional funds of its own. As a result of the bank's stance, BMT Holdings wrote a $25,000 check to Charter Oaks to pay to the bank. The bank then accepted BMT Holdings' offer of $700,000. Thus, in June 1993, BMT Holdings acquired the subject property for a total of $750,000 ($700,000 directly to the bank, $25,000 to the bank via Charter Oaks, and $25,000 in the form of Chestnut's fee).
At trial, Paul stated that February 1996 marked the first time that he heard of a $25,000 payment being funneled to the selling bank through Charter Oaks. Be that as it may, there is no evidence that Emmenegger made any attempt to cover up the transaction's details. Indeed, Smith testified that all three payments appeared properly on the books. Furthermore, there is absolutely no evidence that any of the three plaintiffs obtained a financial benefit from the transaction.[19]
The Court believes that Paul's February 1996 decision to send Smith from London, unannounced, to investigate a $25,000 payment relating to a two-year-old land transaction leads to a reasonable inference that following the January 1996 meeting at which the Lichtfuss share issue exploded, Paul made up his mind to get rid of plaintiffs, and was simply fishing for additional reasons to do so. Such an inference is supported by other instructions that Paul gave to Smith. For example, he asked Smith to look into such trivia as a $400 payment that Emmenegger had made to "Who's Who of Corporate Executives." He also asked Smith to examine Emmenegger's involvement in Dynasty Interiors, a company owned by Emmenegger and his wife, which had on occasion provided goods and services to BMT. With respect to this last item, the record shows that on June 29, 1990, Emmenegger sent Paul a memorandum in which he disclosed that his wife had an ownership interest in Dynasty Interiors, and that BMT had used the company's services. In his July 9, 1990 response to that memorandum, Paul wrote, "This is not material in this case in view of the small size." At trial, Smith testified that prior to his February 1996 visit, he "had been aware that Dynasty Interiors was effectively run by Chuck's wife, and [that] Chuck and his wife owned the business on a 50/50 basis." He further testified that during his February visit, he examined the type of work that Dynasty had performed and the products and services that it had provided, and "generally concluded that the relationship seemed innocent and okay and everybody *995 seemed to be happy that fair value was being received."

I. Aftermath
On May 29, 1996, plaintiffs filed this case. Neither Emmenegger nor Ritzie nor Riley has received payment of either book value or redemption price for any of his phantom shares, including his disputed Lichtfuss shares.
The value for a PSP redemption request made in 1996 would have been based on BMT's 1995 financial statements. The 1996 book value of an originally-issued phantom share was $2,791.34. The 1996 book value of a Lichtfuss share was $2,057.65 ($2,791.34 less the $733.69 book value paid to Lichtfuss at the time of his departure from BMT). The 1996 redemption value for an originally-issued share was $17,232.91. The 1996 redemption value of a Lichtfuss share was $16,499.72 ($17,232.91 less the $733.69 book value paid to Lichtfuss). Thus, in 1996, Emmenegger's 204 original phantom shares had a redemption value of $3,515,513.64, and the 66 original phantom shares owned by Ritzie and the 66 original phantom shares owned by Riley had a redemption value of $1,137,372.06, respectively. With respect to the six Lichtfuss shares claimed by Emmenegger, those had a redemption value of $98,998.32, while the nine Lichtfuss shares claimed by Ritzie and the nine Lichtfuss shares claimed by Riley had a value of $148,497.48.
Under the plan, participants entitled to the redemption value (rather than book value) of their shares were also entitled to a "gross up amount per share." The plan instructs that this gross-up amount is to be determined by multiplying the redemption price per share by a percentage determined as follows: (PARTICIPANT'S FEDERAL INCOME TAX RATE - FEDERAL CAPITAL GAINS TAX RATE) / (100 - PARTICIPANT'S FEDERAL INCOME TAX RATE). For 1996, Emmenegger, Ritzie, and Riley were each subject to a federal income tax rate of 39.6%; the federal capital gains tax rate was 28%. Thus, if the redemption price per share is to be awarded to each plaintiff, it should be multiplied by 19.2053%. Emmenegger would then receive a total of $4,308,686.18 ($4,190,678.51 for his 204 original shares, and $118,007.67 for his six Lichtfuss shares). Ritzie and Riley would each receive $1,532,819.25 ($1,355,807.75 each for their sixty-six original shares and $177,011.50 each for their nine Lichtfuss shares).
Following his departure from BMT, Emmenegger decided that he wanted an opportunity "to own the business." He therefore rejected an offer from Hanna Steel to become its president. After Ritzie left BMT, he sent out a number of resumes in response to newspaper advertisements and also contacted one or two employment search agencies. His efforts were unsuccessful.
In June 1996, Emmenegger contacted Ritzie and asked him whether he would be interested in joining Emmenegger in starting a steel tube company of their own. They determined to do so. On November 14, 1996, Emmenegger and Ritzie, joined by Riley, started a steel tube company called Excalibur Tubular Company. At Excalibur, Emmenegger draws an annual salary of $175,000, while Ritzie and Riley each earn $125,000. They estimate they will each receive an annual bonus amounting to ten percent of their respective salaries. At trial, Ritzie estimated that it would take plaintiffs five years to achieve the salaries which they enjoyed at BMT. His basis for that estimate was that "five years seemed like a reasonable time."
At the time of his departure from BMT, Emmenegger received a base salary of $250,000 per year. Ritzie's annual salary from BMT was $150,000, while Caparo Steel paid $150,000 annually to Riley. In addition, each enjoyed various bonuses, benefits, and perquisites.[20]

*996 II. Conclusions of Law

A. Plan Benefits

In counts II, IV, and VII of their second amended complaint, plaintiffs seek benefits under the BMT PSP, invoking 29 U.S.C. § 1132(a)(1)(B).[21] Specifically, plaintiffs claim that they are entitled to the redemption value of all of their phantom shares, including their Lichtfuss shares. Defendants contend that plaintiffs are entitled to only book value. Defendants argue that because § 2.1 of the plan gives the administering board discretion in making decisions concerning the plan, the Court should review defendants' decision not to award plaintiffs the redemption price for their phantom shares using an abuse of discretion, rather than a de novo, standard of review.
In general, if a benefits plan gives its "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a court reviews a decision made by that administrator or fiduciary for abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir.1998); Hawkeye Nat'l Life Ins. Co. v. AVIS Indus. Corp., 122 F.3d 490, 496 (8th Cir.1997). Under an abuse of discretion standard, a court will uphold a "reasonable" construction of the plan by the plan's administrator. Buttram v. Central States, Southeast and Southwest Areas Health & Welfare Fund, 76 F.3d 896, 901 (8th Cir.1996). Five factors govern the reasonableness inquiry: (1) whether the administrator's interpretation is consistent with the plan's goals, (2) whether the interpretation renders any plan language meaningless or inconsistent, (3) whether the interpretation conflicts with ERISA's requirements, (4) whether the administrator has interpreted the words at issue consistently, and (5) whether the interpretation is contrary to the plan's clear language. Id. However, the abuse of discretion standard is not a constant. Under certain circumstances, a less deferential, "sliding scale" abuse of discretion standard applies. Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir.1998). For example, where the plan administrator labors under a conflict of interest, exercises his powers dishonestly or with an improper motive, or fails to use judgment, the resulting decision may be accorded somewhat heightened scrutiny. Buttram, 76 F.3d at 900. The plaintiff "must show only that the conflict or procedural irregularity had `some connection to the substantive decision reached.'" Woo, 144 F.3d at 1160 (quoting Buttram, 76 F.3d at 901).
Plaintiffs contend that Firestone's abuse of discretion standard is inapplicable because the rationale behind that standard is the fact that the plan administrator operates as a fiduciary of the plan's participants. Plaintiffs point out that the BMT PSP is a "top hat" plan,[22] and that, under ERISA, administrators of "top hat" plans are not held to the same strict fiduciary standards of loyalty and care applicable to ERISA fiduciaries. See Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir.1995), cert. denied, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996). Plaintiffs further note that § 10 of the PSP explicitly disavows "a trust or other fiduciary relationship of any kind" between the PSP's administrator (i.e., the Caparo, Inc., board) and the phantom shareholders.[23] Accordingly, plaintiffs claim that a *997 more stringent standard of review is inappropriate.
Based on all of the evidence presented at trial, the Court believes that it must apply, at the very least, a less deferential standard than abuse of discretion. First of all, there can be no doubt that Paul labored under a conflict of interest in determining that plaintiffs were entitled to only the book value of their phantom shares. BMT is wholly, if indirectly, owned by Paul and his family. Thus, payment for redeemed phantom shares comes out of Paul's wallet. And, it is clear, the impact on that wallet would be, to put it mildly, less substantial if plaintiffs were entitled to only book value, rather than redemption value. In the case of Emmenegger, the difference amounts to over three million dollars.[24] It is also plain that Paul was keenly aware of that fact, as his testimony with regard to the Lichtfuss shares demonstrated.
Aside from Paul's obvious financial conflict of interest, there is another reason why a more rigorous standard of review is appropriate. Paul himself entirely controlled the decision-making process here, as he does with regard to all significant financial decisions in his empire. Paul himself decided to terminate the plaintiffs, and he decided the terminations were for "reasons other than § 8.1," which dictated the book value conclusion. The decision that plaintiffs should receive only the book value of their phantom shares is so bound up in the parties' administration of the PSP itself that it is quite impossible to separate one from the other. The essence of this controversy, after all, and the fundamental basis for defendants' refusal to pay plaintiffs the redemption value of their phantom shares, involves whether, in fact, a redistribution of the Lichtfuss shares took place in April 1994. The decision regarding that redistribution involved the key players on both sides of this litigation: Paul, Emmenegger, and Ritzie. In the context of this case, the appropriate question is not, "Were there any procedural irregularities in the PSP's administration?", but rather, "Was there anything procedurally regular about it?"
The evidence adduced at trial shows that Paul, who was on the board administering the plan and actually made all the decisions, had no understanding of the PSP's provisions. In his testimony, he admitted that until this litigation commenced, he had never even read the plan. He could not recall when Ritzie, one of the other two board members during the relevant time period, became a member of the board. Paul could also not remember who served on the board in 1993 or 1994. Paul provided a good reason for his deficient memory: he did not believe that the Caparo, Inc., board had anything to do with running the plan  despite the plan's clear provision to the contrary. Apparently, Paul thought that decisions regarding the PSP were to be made by Caparo Industries  not by the Caparo, Inc., board. As explained above, however, § 2.1 of the plan plainly states, "the Plan shall be administered by the Board." The plan defines "Board" just as plainly: "The term `Board' means the Board of Directors of Caparo, Inc., a Delaware corporation."
While the Court believes that Emmenegger and Ritzie could have taken better care in documenting the Lichtfuss share redistribution, the evidence shows that their actions were consistent with the plan's provisions and were in no way improper. Unlike Paul, Emmenegger and Ritzie knew that the Caparo, Inc., board was charged with the plan's administration and had the authority, pursuant to § 2.1, to reissue shares. Given Paul's erroneous belief that the Caparo, Inc., board was essentially superfluous, it is easy to believe that he did approve of the Lichtfuss redistribution at the April 1994 (as Emmenegger and Ritzie testified) simply because he did not comprehend that what he was doing had any significance. Indeed, it is uncertain up to this very day whether Paul believes that the boards of any of his companies exercise any real power. At trial, he stated, "I give the final decision as chairman. Directors come to me with suggestions, with recommendations, and I give the final decision." He further stated, "[T]he board really advises me."
*998 With the above as background, the Court concludes that the decision to pay book value, rather than redemption value, to plaintiffs was clearly unreasonable. First, considering factors one and three of the Buttram test, the Court finds that defendants' interpretation of the plan clashes with both the purpose of the plan and the primary purpose of the ERISA statute, i.e., the protection of individual pension rights. See Hawkeye, 122 F.3d at 502 n. 7. At the plan's inception, all parties to it agreed that its goal was to provide an incentive to BMT's senior managers to grow the company. At the same time, continued participation in the plan was not, at least in 1988 or 1991, considered a condition of employment. Yet, by 1996, it had apparently become such a condition  at least in Paul's eyes, as his threats to terminate redeeming participants indicate. Furthermore, by (a) delving into conduct of plaintiffs that either took place in the relatively distant past (e.g., the June 1993 land deal) or was both extremely minor and entirely innocuous (e.g., BMT's dealings with an interior design firm run by Emmenegger's wife) and (b) attempting to use that conduct to justify their present refusal to pay redemption value benefits, defendants perhaps irreparably damaged the plan's loyalty-promoting function.[25]
Defendants have also interpreted the plan in a manner that renders its language meaningless and contradicts the plan's clear language (factors two and five of the Buttram test). The most obvious example of this is defendants' failure to pay plaintiffs even book value for their phantom shares. Defendants' claim that the filing of this lawsuit rendered making those payments inappropriate falls flat. The plan defines "Payment Date" for redeemed shares as "sixty days after any event requiring payment." Riley submitted his redemption request on January 1, 1996  almost five months prior to the commencement of this litigation. Under the plan's terms, he should have received payment on or before March 2, 1996. Emmenegger also submitted the redemption request for his 204 original shares more than sixty days before he brought suit. In not acting on those requests, defendants did not adhere to the letter of the plan.
Defendants' characterization of their reasons for dismissing Emmenegger and Ritzie as "other than those set out in Section 8.1 of the [BMT PSP]" is also inconsistent with other of the plan's provisions. By utilizing that characterization, defendants attempted to invoke § 8.2 of the plan, which provides that a participant dismissed for such "other" reasons is entitled to only book value. In service letters to Emmenegger and Ritzie, Paul explained that those other reasons consisted of "actions and inactions which ... constituted misconduct and neglect." Under § 8.1 of the plan, however, a participant who has committed simple misconduct or neglect is entitled to the redemption value of his shares. Section 8.1 specifically provides that if "the Corporations" terminate a participant "without cause," they "shall" pay him redemption value. Turning to the PSP's definition of "Termination of Employment Without Cause," one finds that "cause" constitutes only "willful or gross misconduct," "willful or gross negligence," "intentional or habitual neglect" of duties, misappropriation of company property, or commission of a felony. The service letters to Emmenegger and Ritzie do not so characterize their conduct, and, as already has been explained at length, such a characterization is not fairly possible.[26] Additionally, to the extent defendants rely on Caparo Steel's lack of success, plaintiffs correctly point out that the plan requires "cause" to relate to the participants' "duties for the Corporations," and the Corporations referred to are BMT and BMT Tube, not Caparo Steel. The facts show that under plaintiffs' stewardship, BMT prospered.
Plaintiffs are entitled to the redemption value of their shares (including their Lichtfuss shares) plus pre-judgment interest,[27] *999 and their reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(1). On this claim Emmenegger is entitled to the redemption value of $4,308,686 plus $524,094 in pre-judgment interest, for a total of $4,832,780. Ritzie and Riley are entitled to redemption value of $1,532,819. Ritzie's pre-judgment interest is $191,431 for a total of $1,724,250. Riley's pre-judgment interest is $191,303, for a total of $1,724,122.

B. Retaliatory Discharge

In count I of their second amended complaint, all three plaintiffs claim that they were discharged in retaliation for exercising their rights to redeem their phantom shares, in violation of § 510 of ERISA, 29 U.S.C. § 1140.
Section 1140 provides, in pertinent part: It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter.... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.
In deciding discriminatory discharge cases brought under § 1140, courts utilize the same analytical framework of burden shifting used in Title VII employment discrimination cases. Kowalski v. L & F Prods., 82 F.3d 1283, 1288-89 (3d Cir.1996); Grottkau v. Sky Climber, Inc., 79 F.3d 70, 73 (7th Cir.1996). Under this framework, a plaintiff must first establish a prima facie case of discrimination by adducing proof (1) that he is a member of a protected class; (2) that he was qualified for his job position; and (3) that he was discharged under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Grottkau, 79 F.3d at 73. Once the plaintiff has made out his prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its discharge of plaintiff. If the defendant meets that burden, the plaintiff must then show that the defendant's proffered reason was really a pretext for discrimination. Grottkau, 79 F.3d at 73. The ultimate inquiry in a case brought under § 1140 is whether the employer took the action in question with the specific intent of interfering with plaintiff's ERISA benefits. Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995), cert. denied, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). The plaintiff must show a "causal connection" between participation in a statutorily protected activity and the adverse employment action. See Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 456 (8th Cir.1995); see also Stafford v. True Temper Sports, 123 F.3d 291, 295 (5th Cir.1997) (plaintiff "need not prove that the discriminatory reason was the only reason" for his loss of benefits); Abbott v. Pipefitters Local Union No. 522, 94 F.3d 236, 242 (6th Cir.1996) (plaintiff must demonstrate that "a motivating factor" in defendant's action was interfering with plaintiff's benefits), cert. denied, ___ U.S. ___, 117 S.Ct. 948, 136 L.Ed.2d 836 (1997); Barbour, 63 F.3d at 37 (same); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222-23 (11th Cir.1993) (same).
Plaintiffs here have clearly established a prima facie case. First, as participants in the PSP, they are obviously members of a protected class. Second, they were plainly qualified for their positions. Their long years of service at BMT and steadily increasing responsibilities attest to that. Third, they were dismissed under circumstances that give rise to an inference that defendants were retaliating against them.
While it is true that Riley submitted his request approximately two months prior to his termination, and Ritzie submitted his redemption request following his termination, the Court finds the timing of those actions to be of little consequence. After Riley submitted his redemption request in January 1996, he received several assurances from defendants that they would make good on that request. Defendants never did so (and there is nothing in the record indicating that they even attempted to do so within the sixty-day time period prescribed by the PSP). Furthermore, defendants' proffered reason for Riley's termination, i.e., poor performance, is *1000 completely implausible, given their decision to award him severance pay, which, according to Caparo Steel's severance policy, is awarded only to employees "who have given the Company excellent service."
Riley's termination, like those of Emmenegger and Ritzie, came at a time when disputes over the PSP had reached a critical mass. The parties had entered into a standstill agreement. The participants were accusing Paul of running his companies in a manner that would depress the value of their phantom shares. Paul was accusing the participants of thinking only of themselves and of stealing the Lichtfuss shares. In Emmenegger's case, his dismissal followed his redemption request by only a matter of days. The evidence shows that Paul believed Emmenegger and Ritzie to be the ringleaders of the Lichtfuss redistribution. Indeed, in suspending Ritzie from BMT (prior to his being fired), Ambar Paul specifically cited Ritzie's conduct with respect to the PSP as the primary reason for the suspension.[28]
Plaintiffs having made out their prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their termination decisions. Defendants claim that they had ample and legitimate cause for terminating plaintiffs. Defendants state that Riley was dismissed for performance reasons, and that Emmenegger and Ritzie were fired for the reasons set forth in their service letters.
Defendants' explanations for terminating plaintiffs are belied by the evidence. As just discussed, defendants' claim that they fired Riley for poor performance simply does not square with their decision to award him severance pay. And, as explained in the findings of fact, defendants' contention that they dismissed Emmenegger and Ritzie because of their failure to adequately control and monitor costs at Caparo Steel is not credible. The evidence shows that Caparo Industries bought an old, mothballed steel mill. Caparo Steel's problems in restarting that facility should hardly have come as a surprise to Paul, an old hand in the steel industry. The fact that Paul initially was of a mind to retain Ritzie at BMT (albeit reducing his salary to $99,000, which would have still left him BMT's second-highest paid employee) is some indication that Paul himself did not view Ritzie's conduct at Caparo Steel as especially flawed. As for Emmenegger, the reasons listed in Paul's service letter evince an attempt to dredge up justifications for a termination decision already made. Paul's complaint that Emmenegger failed to hire an internal auditor for Caparo, Inc.'s United States operation is undercut by the fact that following Emmenegger's firing, no internal auditor was ever hired. Paul's reference to the 1993 real estate deal in which BMT Holdings acquired the four acre parcel adjoining BMT's headquarters only does further damage to the integrity of the service letter as a whole. To reiterate the facts: BMT Holdings spent a total of $750,000 to acquire the property; Paul authorized an expenditure of that amount; Emmenegger made no attempt to hide the $25,000 payment that Paul now finds objectionable; and Emmenegger realized no personal benefit as a result of the transaction. Defendants' attempt to now paint that transaction as sinister is unworthy of credence.
Finally, plaintiffs have proffered considerable evidence showing that a motivating factor behind their dismissals was retaliation for exercising their rights under the plan.[29] The Court has found as a fact that Paul was aware of and approved the Lichtfuss shares' redistribution in April of 1994. When Ritzie and Emmenegger sought redemption of these authorized shares, and refused to rewrite their memories to agree with Paul that the redistribution had not been approved, he fired them. Riley was seen as a confederate, and fired for the same reasons. The service *1001 letters provided to Emmenegger and Ritzie specifically refer to their "failure to follow proper procedures and otherwise act in the best interests of Bull Moose in matters relating to [the BMT PSP]." Plaintiffs have also shown that throughout the first several months of 1996, Paul repeatedly implied that he would fire any participant who cashed in his phantom shares and referred to the Lichtfuss shares as "stolen property." Moreover, the evidence shows that once the decision had been made to fire the plaintiffs because of their insistence on the Lichtfuss distribution, defendants then undertook an intense effort to structure the terminations in a manner calculated to result in plaintiffs' receiving only the book value, rather than redemption value, of their PSP shares. Plaintiffs have clearly proven that defendants acted with the specific intent of interfering with plaintiffs' ERISA benefits, and the Court will enter judgment in favor of plaintiffs on count I.
Under ERISA, a court may award "appropriate equitable relief" to redress a violation of the statute or to enforce any of its provisions. 29 U.S.C. § 1132(a)(3)(B). In a case of retaliatory discharge, an award of back pay or front pay or both constitutes restitution and, therefore, is an equitable remedy within the meaning of the statute. Schwartz v. Gregori, 45 F.3d 1017, 1022-23 (6th Cir.), cert. denied, 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995); see Howe v. Varity Corp., 36 F.3d 746, 756 (8th Cir.) (stating that district court's award of payments that plaintiffs "would have received if they had remained members of [their employer's welfare benefits plan]" constituted "restitution"), clarified by 41 F.3d 1263 (8th Cir.1994) (per curiam), affirmed, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).
Plaintiffs in this case seek both back pay (from the date of their respective terminations to the start of trial) and five years of front pay. The record does not justify such an award. Plaintiffs have not shown that following their termination from BMT they were particularly diligent in attempting to secure new employment. Emmenegger testified that he in fact rejected an offer to become the president of another steel company without even bothering to ascertain the salary. Ritzie testified that his job search was limited to answering newspaper advertisements and contacting "one or two" employment agencies. Riley said nothing at trial regarding what efforts he made to locate a new job. In order to award back pay for the entire period requested by plaintiffs, the Court would have to rely on nothing more than plaintiffs' say-so. Plaintiffs' request for front pay has an even more infirm foundation. It is based on nothing other than Ritzie's assertion that it will take plaintiffs five years to reach the salary levels that they enjoyed at BMT. The Court will not award front pay on such guesswork.[30] In this case, the Court finds that the record supports only a limited award of back pay to each plaintiff. For each plaintiff, that award will consist of the salary and benefits that he would have received for the period starting with the date of his termination to November 15, 1996, the date plaintiffs began working at Excalibur Tubular Company. In Emmenegger's case, the Court calculates this amount to be $175,000. For Ritzie the back pay award is $90,000. Riley is entitled to $110,000 in back pay. The Court finds that plaintiffs are entitled to their reasonable attorneys' fees and costs on these claims as well. 29 U.S.C. § 1132(g)(1).

C. Severance Pay

In counts IV and VII, plaintiffs Emmenegger and Ritzie seek severance pay under BMT's severance policy. That policy, which is found in the "Personnel Policies and Procedures Manual" of Bull Moose Tube Company, states, "It is the Company's policy to provide severance pay to employees who are terminated for reasons other than disciplinary and who have given the Company excellent service...." In its January 27, 1997, memorandum and order in this case, the Court determined that the BMT severance policy is an ERISA plan. 953 F.Supp. at 295-96. The Court found that the policy gives its administrator discretion in determining *1002 (1) whether the terminated employee was dismissed for reasons other than cause, and (2) whether he gave the company "excellent service" during his time at BMT.
Defendants argue that regardless of whether an abuse of discretion or a de novo standard of review applies, the Court should uphold their decision not to award Emmenegger and Ritzie severance benefits. The Court disagrees. Just as with plaintiffs' claim for benefits under the PSP, a "normal" abuse of discretion standard is inappropriate here. The reason for this is plain: defendants suffered from a blatant conflict of interest in determining whether Emmenegger and Ritzie were entitled to severance.
Having determined that it must apply a heightened standard of review, the Court finds that defendants' decision not to award severance pay to Emmenegger and Ritzie was plainly unreasonable. As the Court has already found with respect to plaintiffs' claim of retaliatory discharge, defendants' explanation that they terminated Emmenegger and Ritzie for disciplinary reasons does not withstand even mild scrutiny. These two plaintiffs each served BMT for well over a decade. During their tenure and under their leadership, BMT enjoyed enormous success. Paul demonstrated his satisfaction with plaintiffs' performance by putting them in charge of the Caparo Steel project. It may well be that in taking on that challenge, plaintiffs overextended themselves. But it is hardly the case that Caparo Steel's problems were, in the main, of plaintiffs' doing. The evidence shows that problems continued to plague the company long after plaintiffs' departure. Furthermore, whatever occurred at Caparo Steel did not detract from plaintiffs' performance at BMT. What is at issue in counts IV and VII, after all, is BMT's severance policy  not that of Caparo Steel. The conclusion is inescapable: Emmenegger and Ritzie provided BMT with many years of excellent service, and upon their termination, were entitled to severance pay. Under the terms of BMT's personnel manual, Emmenegger should have received sixteen weeks of such pay, or $76,923. Ritzie should have received twelve weeks severance pay or $34,615. Emmenegger is entitled to $9,578 in pre-judgment interest on this award; Ritzie is entitled to $4,280 in pre-judgment interest. In addition, both plaintiffs are entitled to their reasonable attorneys' fees and costs on this claim as well.
Finally, the Court declines to award plaintiffs the additional sums they seek which they characterize as defendants' interest "windfall." While it is clear that defendants have benefited from the "spread"  the difference between the legal rate of pre-judgment interest due and the real value of having the use of plaintiffs' money for the past two years  there is no legal basis for awarding this "windfall" to plaintiffs. To the extent plaintiffs argue for the award as a matter of equity, the Court declines to exercise its equitable power in this way.
A separate judgment in accordance with this memorandum and order is entered this same date.
Plaintiffs are reminded of their obligation to file their bill of costs and their motion for attorneys fees within the time set by local rule.

JUDGMENT
This matter having come before the Court for bench trial and the issues having been duly tried before the Court, and in accordance with the Memorandum Opinion entered this same date,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that plaintiff Charles E. Emmenegger shall have judgment against defendants Bull Moose Tube Company, Caparo, Inc., Bull Moose Tube, Ltd., and Swraj Paul, jointly and severally, in the amount of $5,094,281.00.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that plaintiff Robert F. Ritzie shall have judgment against defendants Bull Moose Tube Company, Caparo, Inc., Bull Moose Tube, Ltd., and Swraj Paul, jointly and severally, in the amount of $1,853,145.00.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that plaintiff James E. Riley shall have judgment against defendants Bull Moose Tube Company, Caparo, Inc., Bull Moose Tube, Ltd., and Swraj Paul, jointly and severally, in the amount of $1,834,122.00.
*1003 IT IS FURTHER ORDERED that all plaintiffs shall recover post-judgment interest at the legal rate of 5.375% from this date forward, and shall recover attorneys fees and their taxable costs of this action.
NOTES
[1] The PSP defined "Corporation" to mean BMT.
[2] The revised PSP defined "Corporations" to mean BMT and BMT Tube Ltd.
[3] Section 8.1 provides:

When an Original Participant ceases to be an employee of the Corporations at any time before October 19, 1993 or a New Participant ceases to be an employee of the corporation before becoming fully vested by reason of his Termination of Employment Without Cause, Retirement, Disability or death, the Corporations shall pay him (or in the event of his death, his Beneficiary) an amount of cash equal to the Redemption Price Per Share of each Phantom Share then vested with respect to such Participant, using the termination date as the Calculation Date.
Section 8.2 of the revised PSP provides:
Notwithstanding the other provisions of this section 8 or any other provision of the Plan, if a Participant ceases to be an employee of the Corporations for any reason other than those set out in subsection 8.1, then in respect of each vested Phantom Share held by such Participant, the Corporations shall pay to the Participant an amount of cash equal to the Book Value Per Share. All Phantom Shares unvested as of the termination date shall be forfeited. Such forfeited Phantom Shares shall be available for award to other Participants.
[4] The record indicates that of the twenty-seven shares, Emmenegger supplied 34% (or 9.18 shares), and the other six participants each supplied 11% (or 2.97 shares).
[5] Under the terms of both the original PSP and its 1991 revision, one-third of a participant's shares vested on each of the first, second, and third anniversaries of the participant's "award date" (the date on which the participant was awarded his shares).
[6] At the time of Lind and Burnett's termination, a share of phantom stock had a book value of approximately $673 and a redemption value of zero.
[7] $95,446 = ($2,185 × 66 shares) - $48,444 (the sum paid to Lichtfuss).
[8] During plaintiffs' cross-examination, Paul claimed that he could not recall the fact that in 1996, BMT paid Caparo, Inc. (BMT's sole shareholder) dividends and distributions totaling over nineteen million dollars.
[9] Plaintiffs were not even the chief beneficiaries of the redistribution; three other participants were each allotted eleven Lichtfuss shares.
[10] On November 20, 1995, Emmenegger and Ritzie sent a memorandum to Paul listing "accounting and systems projects for Caparo Steel." According to Emmenegger, the memorandum represented a request that Paul send personnel from the U.K. to assist in those projects. Paul rejected this request for assistance.
[11] The record indicates that on June 29, 1990, Emmenegger had sent a memorandum to Paul disclosing that he served on CMR's board of advisors. Emmenegger testified at trial that he served on that board for three years and received a total compensation of $500 for doing so.
[12] The participants' fears came to pass. On February 11, 1997, Coopers issued its audit report on the consolidated financial statements of BMT and its subsidiaries for 1995 and 1996. The report stated that BMT paid dividends to Caparo, Inc., its sole shareholder, of $11,643,000 in 1995, and $19,284,000 in 1996.
[13] In the original PSP, § 1.6 provided that any time a dividend on BMT's common stock was paid, a PSP shareholder was entitled to cash equal to that dividend multiplied by 1.1111 for each phantom share he held. The 1991 revision to the PSP, however, changed the relevant stock to that of Caparo, Inc. rather than that of BMT.
[14] Later, a meeting of BMT's senior managers on April 10, 1996, Paul referred to the Lichtfuss shares as "stolen property," which "they" had "no right to issue," and told the recipients of the redistributed shares that their remedy, if any, was against Emmenegger and Ritzie.
[15] In an earlier memorandum dated April 13, 1996, Smith had recommended retaining Ritzie, albeit at a lower salary, if he submitted an acceptable apology letter.
[16] The language of BMT's severance policy is identical.
[17] Paul stated that he sent Smith and Steele from the U.K. to do this job "every month more or less." Steele and Smith testified they did not serve in that role.
[18] At the time this transaction took place Paul was aware of Emmenegger's connection with Mike Rallo of Charter Oaks, Chestnut, and CMR.
[19] If anything, the record shows that the decision to purchase the land was a wise one. In November 1994, a commercial real estate company offered to purchase the property acquired by BMT Holdings in June 1993 for $1.2 million. Emmenegger informed Paul of this offer. Although the prospective buyer subsequently increased its offer to $1.5 million (twice what BMT had paid), Paul decided not to sell the property at that time.
[20] Under a bonus plan in effect at the time that Caparo, Inc., purchased BMT, BMT's senior executives received an annual twenty to twenty-five percent bonus or more if the "profit plan goal" for that year was met. Under a "Pool Executive Bonus Scheme" established in 1988, a senior manager was also eligible for annual payouts determined on the basis of BMT's profit for the relevant year. The individual pay-out was $0 for 1992, $11,503 for 1993, $63,462 for 1994, and $57,784 for 1995. The companies also paid the plaintiffs' country club dues: $500.00 a month for Emmenegger and Ritzie, respectively, and $350.00 a month for Riley. Plaintiffs also each received a monthly car allowance in the amount of $710.00. Finally, the companies contributed a sum equal to at least two percent of the base pay for each of plaintiffs into a 401(k) plan. Two percent of Emmenegger's base salary in 1996 was $5,000, $3,000 each in the cases of Ritzie and Riley.
[21] The statute authorizes a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).
[22] A "top hat" plan is an unfunded benefit plan maintained by an employer "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). This Court previously determined that the PSP was a "top hat" plan. Emmenegger v. Bull Moose Tube Co., 953 F.Supp. 292, 293-94 (E.D.Mo.1997).
[23] Section 10 of the revised PSP provides that the Corporations are not required to set aside funds for the purpose of satisfying their obligations under the plan. The section further provides that nothing contained in the PSP nor any action taken pursuant to the plan "shall create or be construed to create a trust or other fiduciary relationship of any kind between or among the Corporations, the Board, a Participant, a Beneficiary, and any other person."
[24] The book value of Emmenegger's shares (including his six Lichtfuss shares) is $581,779.26 ((204 original shares multiplied by $2,791.34) + (6 Lichtfuss shares multiplied by $2,057.65)). The redemption value of his shares (including his six Lichtfuss shares) is $3,614,511.96 ((204 original shares multiplied by $17,232.91) + (6 Lichtfuss shares multiplied by $16,499.72)).
[25] The Court notes that BMT's current president is the only remaining shareholder in the PSP.
[26] Again, given the fact that defendants awarded severance pay to Riley, the characterization is totally inconsistent in his case.
[27] Pre-judgment interest runs in each case from the date payment was due (60 days after each redemption request), and the rate of interest used for each plaintiff is that in effect on that date. See 28 U.S.C. § 1961; Mansker v. TMG Life Insurance Company, 54 F.3d 1322, 1331, n. 9 (8th Cir.1995).
[28] As § 1140 states, it is unlawful to, inter alia, "suspend ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140 (emphasis added).
[29] Given the hollowness patent in defendants' explanations of plaintiffs' dismissals, the Court believes that in this case, addressing McDonnell Douglas's third prong is superfluous. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination."). It does so only for the sake of thoroughness.
[30] The Court further notes that Excalibur is, in essence, plaintiffs' company, and thus plaintiffs have the power to set their own salaries.